UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Syngenta Seeds, LLC,

        Plaintiff,

v.

Todd Warner, Joshua Sleper, and
Farmer's Business Network,

        Defendants.

File No. 20-cv-1428 (ECT/DTS)

**OPINION AND ORDER**

---

Anderson Tuggle, Bryan K. Washburn, Jeffrey P. Justman, and Matthew B. Kilby, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; Alison J. Baldwin, Faegre Drinker Biddle & Reath LLP, Chicago, IL; and Matthew Burkhart, Faegre Drinker Biddle & Reath LLP, Indianapolis, IN, attorneys for Plaintiff Syngenta Seeds, LLC.

Todd Warner, *pro se*.

Autumn Gear, Bruce H. Little, and Timothy Y. Wong, Barnes & Thornburg LLP, Minneapolis, MN, attorneys for Defendant Joshua Sleper.

Caitlin Gehlen and Loren L. Hansen, Lathrop GPM LLP, Minneapolis, MN; Kaitlin Elizabeth Keohane, Quinn Emanuel Urquhart & Sullivan, LLP, Redwood Shores, CA; Morgan William Tovey, Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, CA; Ryan Landes, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA, attorneys for Defendant Farmer's Business Network.

---

       Syngenta Seeds, LLC believes that two of its former employees—Todd Warner and Joshua Sleper—took its confidential business information and trade secrets and used them to help a competitor, Farmer's Business Network ("FBN"). In this case, Syngenta alleges that FBN, Warner, and Sleper misappropriated Syngenta trade secrets and that Warner and Sleper breached their employment agreements.

Ten (sometimes interdependent) motions require a decision.  Defendants together filed five motions: a motion for summary judgment, a motion to exclude Syngenta's technical expert, a motion to exclude Syngenta's forensic expert, a motion to exclude Syngenta's damages expert, and a motion to strike the declarations of two Syngenta employees.  And Warner individually filed a summary-judgment motion.  Syngenta filed four motions: a motion for partial summary judgment, a motion to exclude Defendants' technical expert, a motion to exclude Defendants' forensic expert, and a motion to exclude Defendants' damages expert.

The upshot is this:

- Summary judgment will be entered in FBN's favor, and partially in Warner and Sleper's favor, because no reasonable juror could find for Syngenta on its trade-secret-misappropriation claims.  Important to this summary-judgment decision, Defendant's motion to exclude Syngenta's technical expert will in relevant part be granted, as will Defendants' motion to strike the declaration of a Syngenta employee.  Syngenta cannot rely on these two witnesses' testimony to show the presence of a genuine fact dispute as to its trade-secret claims.

- Warner's separate summary-judgment motion will be denied.

- Syngenta's motion for partial summary judgment will be granted as to both Warner and Sleper.

- All other motions will be denied.

These rulings leave no claims remaining against FBN.  Left for trial are Syngenta's claims against Warner for tortious interference with contract and breach of contract, and Syngenta's claims against Sleper for breach of contract.  With respect to Syngenta's claims against both Warner and Sleper under § 14(a) of their employment agreements, the only issue for trial will be damages.

I

*Syngenta's relevant business activities.*   Syngenta is an agriculture technology company that develops and produces plant seeds through advanced research-and-development and data analytics.   ECF No. 618-52 at 21.[1]   Syngenta's objective is to produce new seed varieties that maximize desirable genetic characteristics and minimize undesirable characteristics.   *Id.* at 21–22.   To this end, Syngenta uses "data-driven trial designs" to "improve seeds offerings through breeding plants to enhance precise characteristics."   *Id.*   Through genotypic, phenotypic, and environmental data, "Syngenta is able to evaluate and predict which seed genetics are best for particular environments."   *Id.* at 22–23.   It then selects the best progeny for market release, use in hybrid seed production, or use as a parental line.   *Id.* at 33–34, 49, 115.   After expending "hundreds of millions of dollars in research-and-development expenditures" resulting in "decades of research" and "billions of datapoints," Syngenta has developed "vast germplasm" and "the most advanced products in the market."   *Id.* at 115, 126, 130.

*Syngenta's trade-secret protective measures.*   Syngenta has policies and procedures to ensure that its trade-secret information remains confidential.   *Id*. at 116–25.   For example, it limits visitor access in its buildings and requires key cards for entry.   *Id.* at 116–18.   It operates an in-house department solely responsible for monitoring IT security threats and uses several software programs to identify and protect against security breaches.   *Id.* at 121.   As discussed in more detail below, Syngenta requires its employees to sign

---

[1]     All page citations are to ECF pagination except for deposition transcripts, which are cited to the transcript's original pagination.

nondisclosure agreements, and it documents its confidentiality policies elsewhere, including an "Employee Handbook" that "contains strict confidentiality policies, and codes of conduct governing [employees'] access, use, and disclosure of confidential information." *Id.* at 119–20. Employees must acknowledge their understanding of these policies and re-confirm their understanding of Syngenta Codes of Conduct on an annual basis. *Id.* at 120. Syngenta mandates that its employees receive training regarding the protection of trade secrets, information security, corporate ethics, conflicts of interest, responsible business communications, and fraud prevention. *Id.* at 124.

*Warner's role at Syngenta.*  Warner, a Minnesota resident, was a leader in Syngenta's research-and-development division, serving most recently as the "Head Quantitative Breeding Data Management and Analysis" and, before that, as "Head Corn Genetic Project Discovery Lead, Scientist IV." ECF No. 552-1. In these roles, Warner "[e]stablished database logic for historical data including genotype, phenotype, and environmental data for multi-use applications (including genomic prediction, genomic selection, trial design, and product development pipeline optimization, etc.)." *Id.* He was a "[k]ey contributor to development of germplasm and breeding strategies in developing markets working directly with breeding teams." *Id.*

*Sleper's role at Syngenta.*  Sleper, also a Minnesota resident, was a research-and-development scientist focused on Syngenta's genetic and quantitative breeding, and he reported directly to Warner until November 2019. ECF Nos. 552-5, 664-1 at 120–21. Sleper testified that his role was to "utilize breeding data to make the breeding process more efficient." ECF No. 665-2 at 53.

4

*Syngenta's activities regarding the GA21 trait and Warner and Sleper's involvement in those activities.* One of the most significant projects Warner and Sleper contributed to at Syngenta involved GA21 testing and analysis. The GA21 trait is intended to transmit resistance to glyphosate herbicide when introduced into both inbred and hybrid corn seed lines. ECF No. 551-5 at 26–30. Syngenta acquired the GA21 patent in 2004 and has been using it for testing and commercialization since. ECF No. 665-3 at 183. After it released its first GA21 seed in 2007, Syngenta observed ████████████████████████ ██████████████████████. *Id.* at 188–89. This sparked intense research and development, which led to a finding that ████████████████████████████ ██████████. *Id.* at 192, 204. Based on this project, Syngenta created ██████████ ████████████ testing and screening program, ██████████████████████████ ██████████████████████████████████████████████████ ██████████████ *Id.* at 192; ECF No. 665-4. In 2018, Syngenta ██████████████ ██████████████████████ so it launched additional projects in which Warner and Sleper were heavily involved. ECF No. 665-3 at 208–09, 212. Warner and Sleper's task was to review Syngenta's ████ ████████ processes and develop improved analyses and methods. ECF Nos. 673-19, 665-2 at 142–45. Through this project, Sleper created a GA21 ████████████ model ████████████████████████████████████ ECF Nos. 665-2 at 143–46, 665-3 at 253–55.

*Warner and Sleper's work on prediction models.* In addition to the GA21 project, Sleper created ██████████████ files to develop prediction models for the breeding program. To do this, "Syngenta must ████████████████████████████████████████████

████████████████████████████████████████████   ECF No.

618-52 at 74–75.  These calculated marker effects allow Syngenta to estimate and predict

lines with "specific tester combinations" and "calculate an overall breeding value for lines

that are generated in the pipeline."  *Id.* at 75.  Based on their research and Syngenta

historical data, Warner and Sleper created a presentation for Syngenta leadership titled

"Reimagining Early Stage Breeding: Automation and Accelerating Genetic Gain."  ECF

Nos. 669-6, 669-7.  The presentation provided research "around automating the early stage

of corn breeding" and gave a "high level overview of how to accelerate genetic gain" at

Syngenta.  ECF No. 669-6.

    *Warner and Sleper's Syngenta employment agreements.*   Both men signed

essentially identical employment agreements with Syngenta.  ECF Nos. 552-2, 552-6.  The

agreements contain three provisions relevant to this case.  The first is a non-compete

provision (§ 5(c)), which generally prohibits employees from "engag[ing]," "directly or

indirectly, as principal, agent, [or] consultant," in the same type of "Business" as Syngenta

during their employment and for one year thereafter.  *Id.* §§ 5(c), 12, 13.  The second is a

nondisclosure provision (§ 6(a)), which requires employees to "keep and maintain" a

defined subset of "Confidential Information in strictest confidence" and, except as required

for their assigned work, to refrain  from "us[ing]," "publish[ing]," or "disclos[ing]" "any

information, knowledge or data relating to the Company" or "owned by, controlled by or

in the possession of the Company."  *Id.* § 6(a).  "Confidential Information" is defined in

Syngenta's Confidential and Proprietary Rights Agreement to include a long list of items

ranging from "product or service information" to "trade secrets" to "fees, costs and pricing

structures" and "all similar and related information in whatever form."  ECF No. 552-4 at 3, § 4.  The third is a provision requiring employees to return certain company property upon the termination of employment.  ECF Nos. 552-2, 552-6 § 14(a).  This requirement applies to all "documents, whether or not obtained from [Syngenta], which pertain to [Syngenta], contain Confidential Information or were received or used by [the e]mployee in connection with [his] employment by [Syngenta]."  *Id.*

*FBN's business activities.*  FBN is an "information network and e-commerce platform" that allows farmers to create a profile and anonymously input information about their crops and the productivity of their farms.  ECF No. 670-2 at 4.  The data is then made public to all members.  *Id.*  FBN also sells seeds, crop protection, nutrients and fertilizers, and biostimulants.  *Id.*  Before 2019, FBN purchased or licensed seeds from third parties; in 2019, it took steps to establish an internal seed-breeding program.  *Id.* at 5.

*FBN takes steps to establish a seed-breeding program, including communications with Warner.*  In 2019, FBN acquired a group of companies affiliated with Pegasus Genetics, a research, development, and sales organization that also had a breeding operation.  ECF No. 618 at 18–19.  By May 2019, Warner was in touch with Ron Wulfkuhle, a former Syngenta employee who had become the head of FBN's Seed R&D Department.  ECF Nos. 664-3 at 3, 670-7 at 53, 552-13, 552-14.  Warner wrote to Wulfkuhle that he was "interest[ed] in the opportunity to setup a cutting edge molecular breeding and modeling team" and that he and Sleper had worked together to create the systems currently in place at Syngenta, and that they "can jump start early stage breeding at FBN that exploits new technology implementation."  ECF No. 552-13.

7

*The Albert Lea meeting.*   These initial contacts led to a meeting between Warner, Sleper, and Wulfkuhle at a restaurant in Albert Lea, Minnesota, in June 2019, while both Warner and Sleper were still employed at Syngenta.   ECF No. 665-2 at 153–54.   The meeting lasted "an hour or two."   *Id.* at 181; ECF No. 552-14 at 2.   After the meeting, Wulfkuhle wrote to another FBN employee that Warner and Sleper had "great ideas on how to bring genomics and phenomics concepts to life . . . to outperform the multinationals."   ECF No. 552-14 at 2.

*Warner and Sleper share the "BreedingPlanCosts" document with FBN.*   A few days after the Albert Lea meeting, Warner and Sleper sent Wulfkuhle an email with the subject line, "Seed R&D Plans," in which they "develop[ed] a vision document for a new breeding team at FBN" and included "basic cost structures needed to implement this plan." ECF No. 552-16.   Specifically, Warner and Sleper attached to the email a PDF entitled "BreedingPlanCosts," which included information about developing germplasm and accelerating genetic gain beyond industry standards.   *Id.*; ECF No. 551-4.   At least on the surface, the PDF appears to describe, in general terms, strategies and cost allocations for a hypothetical breeding program.   *Id.*   The document very closely mirrors the Reimagining Presentation that Warner and Sleper created for Syngenta leadership—they are almost word for word the same.   *See* ECF No. 669-7.   Sleper testified that they created the BreedingPlanCosts document in response to Wulfkuhle's request that they send him slides on their "basic vision and understanding" of what they would do, if hired, to capture five to ten percent of the market share for FBN.   ECF No. 665-2 at 156–58.   FBN shared the document internally.   ECF No. 671-5.   One day after sending the BreedingPlanCosts

8

document, Warner and Sleper met with Matt Meisner, FBN's head of data analytics.  ECF Nos. 671-3 at 32–33, 664-6.  Meisner's notes from this meeting describe Warner and Sleper's vision for FBN to "catch up quickly with the big companies and outcompete if [they] do it right" and their opinion that "[d]ata is king."  ECF No. 671-6.  Under Warner's qualifications and experience, Meisner listed "historical data from SYT," where "SYT" stands for Syngenta.  *Id.*

*Warner and Sleper continue to work for Syngenta and continue to communicate with FBN.*  In text messages between the two men in October 2019, Sleper wrote that "no one gets how much we know," asked Warner about the expiration date for a particular patent, and suggested that they "find some more data."  ECF No. 551-8.  Warner testified that these texts were about his and Sleper's potential employment at FBN.  ECF No. 551-3 at 253–55, 257–58, 260.  Warner and Sleper continued to communicate with FBN in subsequent months.  ECF Nos. 552-17, 552-18, 552-19.

*FBN employs Sleper but not Warner.*  FBN formally offered to hire Sleper in April 2020 and Warner in May 2020.  ECF Nos. 618-7 at 116–17, 618-10 at 15–16.  FBN staggered the offers to maneuver around the non-compete period in both Warner's and Sleper's Syngenta employment contracts.  ECF Nos. 552-2, 552-6, 552-23, 552-24, 552-25.  Sleper provided notice of his FBN job offer on April 22, 2020, and he began work for FBN about a month later on May 18, 2020.  ECF Nos. 552-26, 552-9 at 116.  On Sleper's last day at Syngenta, he turned in his laptop and phone.  ECF No. 552-9 at 39.  Warner provided notice of his intent to accept a job offer with FBN on May 13, 2020, and on May 26, 2020, Syngenta invoked its non-compete option.  ECF Nos. 552-32, 551-3 at 156–

57. Because Warner's offer from FBN was contingent on Syngenta waiving the non-compete provision, Warner was never employed by FBN. ECF No. 618-10 at 15–16.

*Sleper's work while employed at FBN.*   At FBN, one of Sleper's first tasks was to create a list of seed lines for FBN to order for its breeding program. About a week after he began work at FBN, Sleper circulated a recommended list of 84 seed lines. ECF No. 618-50. Shortly thereafter, Sleper gave the list to Scott Johnson, FBN's Senior Corn Breeder, who approved an order for several seed lines based on that list. ECF Nos. 618 at 129–31, 670-3 at 262. Sleper also created a "Pipeline Proposal" presentation, which he co-authored with FBN colleague James Johnson. ECF Nos. 618-41, 665-2 at 218, 222. The purpose of the presentation was to explain "the evolution of plant breeding at FBN going forward." ECF No. 665-2 at 218. Sleper and Johnson presented the Pipeline Proposal to the FBN Seeds R&D team in June 2020. ECF No. 665-2 at 222.

*Sleper spoliates evidence.*   Six months after joining FBN and three days after being named a party in this case, Sleper used a program called "CCleaner®" on his personal laptop and his external LaCie Drive, which permanently deleted files and spoliated potential evidence.[2] ECF No. 532 at 8–9, 12–13. Sleper disclosed this to FBN and was put on unpaid leave pending this case's outcome. ECF No. 618-20 at 125. Since then, FBN has had no meaningful contact with Sleper. ECF No. 532 at 11–12.

---

[2]   Magistrate Judge Thorson found "that Dr. Sleper's conduct warrant[ed] the imposition of an adverse inference on Syngenta's breach-of-contract claim as it is asserted against Dr. Sleper." ECF No. 532 at 16–17.

*Syngenta files this case.*  Syngenta brought this action in June 2020 against Warner for breach of contract and misappropriation of trade secrets under federal and state law. Compl. [ECF No. 1] ¶¶ 71–96.  By stipulation, the Parties agreed that Syngenta could conduct expedited third-party discovery of FBN and its employees.  ECF Nos. 6–9.  That discovery led Syngenta to amend its complaint to add claims against Sleper and FBN.  *See* Am. Compl. [ECF Nos. 38–39] ¶¶ 90–139.  At that point, Syngenta included claims for breach of contract; violations of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-153; violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b); tortious interference with a contract; violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and civil conspiracy.

*Relevant procedural history.*  Warner filed an answer to the Amended Complaint, ECF No. 53, but FBN and Sleper filed a joint motion to dismiss the case under Rule 12(b)(6).  ECF No. 61.  Shortly before filing a response to the motion, Syngenta filed a Second Amended Complaint.  ECF No. 69.  FBN and Sleper's motion to dismiss was granted in part and denied in part.  ECF No. 159.  Syngenta's claims for tortious interference with contract against Sleper and FBN and its claim under the California Unfair Competition Law were dismissed.  *Id.* at 2, 47.  All other claims moved forward.

## II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted). A "smoking gun" is not required for the non-movant to defeat a summary judgment motion. *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 360 (8th Cir. 1995). But the non-movant must show "more than mere speculation, conjecture, or fantasy." *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (citation and quotations omitted); *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 716 (8th Cir. 2019).

Courts take a slightly modified approach where, as here, there are cross-motions for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). When considering Defendants' joint motion and Warner's motion, the record must be viewed in the light most favorable to Syngenta, and when considering Syngenta's motion, the record must be viewed in the light most favorable to Warner and Sleper. *See id.* Importantly, "the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the case to a plenary determination on the merits." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).

To confirm, there are three summary-judgment motions here: Defendants' Motion for Summary Judgment, Or In The Alternative, Partial Summary Judgment [ECF No. 614]; Plaintiff's Motion for Partial Summary Judgment Against Defendants Joshua Sleper and Todd Warner [ECF No. 547]; and Defendant Todd Warner's Motion for Summary Judgment [ECF No. 561]. Rather than address each of these motions separately, this order

first addresses whether summary judgment is appropriate against Syngenta's trade-secret-misappropriation claims.  It then addresses the motions as they concern Warner and Sleper.

III

A

Courts commonly analyze parallel claims brought under the Defend Trade Secrets Act (DTSA) and a state trade secret statute together, *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018), because the DTSA is "modeled on the Uniform Trade Secrets Act [UTSA], versions of which have been adopted by 48 states."  *Heska Corp. v. Qorvo US, Inc.*, No. 1:19CV1108, 2020 WL 5821078, at *4 (M.D.N.C. Sept. 30, 2020) (quoting H.R. Rep. No. 114-529, at 199 (2016)).  Though North Carolina happens to be one of two states that has not adopted the UTSA, the Parties' arguments in this case do not implicate any differences between the DTSA and the North Carolina Trade Secrets Protection Act (NCTSPA).  The two statutes will therefore be analyzed together.

To show trade-secret misappropriation, Syngenta must show "the existence of a protectable trade secret and misappropriation of that trade secret."  *See MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1016 (8th Cir. 2020); 18 U.S.C. § 1836. As relevant here, both the DTSA and NCTSPA define a "trade secret" as "business or technical information" that (1) is the subject of "reasonable efforts" to maintain its secrecy and (2) derives "actual or potential" "independent" economic or commercial value from not being "generally known or readily ascertainable."  N.C. Gen. Stat. § 66-152(3); 18 U.S.C. § 1839(3); *see CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018); *Prometheus Grp. Enters., LLC v. Viziya Corp.*, No. 5:14-CV-32-BO, 2014 WL

13

3854812, at *7 (E.D.N.C. Aug. 5. 2014). Under both statutes, "a plaintiff must identify a trade secret with sufficient particularity." *Krawiec v. Manly*, 811 S.E.2d 542, 547–48 (N.C. 2018); *see Integrated Process Sols., Inc. v. Lanix LLC*, No. 19-cv-567 (NEB/LIB), 2019 WL 1238835, at *4 (D. Minn. Mar. 18, 2019).

As to FBN, misappropriation is (1) "acquisition of a trade secret . . . by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). As to Sleper and Warner, Syngenta must show "disclosure . . . of a [Syngenta] trade secret . . . without express or implied consent by a person who . . . at the time of disclosure . . . knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret." *Id.* § 1839(5)(B)(ii)(II).

Whether Syngenta is required to show more than these elements has been the subject of some dispute. Magistrate Judge Thorson ordered Syngenta to "identify in writing and serve on the parties, with a level of particularity that is reasonable under the circumstances, each asserted trade secret." ECF No. 59 at 4. The order further required that "[t]he identification must be sufficiently particularized to allow the other party to meaningfully compare the asserted trade secret to information that is generally known or readily ascertainable and to permit the parties and the Court to understand what information is claimed to be the trade secret." *Id.* Syngenta ultimately filed a document, referred to as the "Identification," purporting to identify the trade secrets at issue. ECF No. 551-12. Although the Defendants take issue with the timeliness of this filing, both sides point to this document as governing Syngenta's claims here.

14

The Parties thus effectively include an additional element in Syngenta's trade-secret burden: whether the Identification sufficiently identified the claimed trade secrets. The Parties dispute this additional element at some length, with Syngenta often relying almost solely on the Identification for its argument that certain information constitutes trade-secret information, and Defendants repeatedly claiming that Syngenta should be precluded from claiming such information as trade secrets because it was not sufficiently identified in the court-ordered Identification.

Defendants are incorrect for the most part in their assertions regarding the Identification. While Syngenta did not outline precise language from which it derives its trade-secret claims (and as discussed below, even the precise language requires expert-witness interpretation to yield the alleged trade secrets), its Identification sufficiently described the types of information that Syngenta claims are at issue here. For example, the BreedingPlanCosts document contains a bullet point regarding GA21 ███ that Syngenta claims discloses a trade secret. The information in this bullet point is encompassed by ¶ 7 of the Identification, and specifically subparagraph (e), which claims as a trade secret ████████████████████████ GA21 ██████ and resulting effects based on Syngenta's data compilations." ECF No. 551-12. The remaining trade secrets underlying Syngenta's misappropriation claims are similarly sufficiently described in the Identification, and this order will not address further the Defendants' contentions with regard to the sufficiency, or lack thereof, of Syngenta's Identification. However, to the extent that Syngenta relies solely on the Identification to establish the trade-secret character of the information in the Identification, that reliance is misplaced. The Identification

merely sets forth Syngenta's belief that certain information is a trade secret. It is not evidence that any of that information is a trade secret.

B

1

Syngenta's primary evidence to demonstrate the first element of its misappropriation claims—that the information was a trade secret in the first instance—comes from the testimony of expert witness Dr. J. Stephen Smith. Dr. Smith is Syngenta's technical expert on seed breeding. He is an Affiliate Professor in the Department of Agronomy and a Lecturer in the Seed Science Center at Iowa State University. ECF No. 551-5 at 6. He holds a B.Sc. in plant sciences from Wye College, University of London, and a M.Sc. in conservation and utilization of plant genetic resources and a Ph.D. in taxonomy and evolution of maize from the University of Birmingham, England. *Id.* Smith spent 35 years working for Pioneer Hi-Bred and DuPont-Pioneer, where he conducted research involving both the public and commercial sectors. *Id.*

Specifically, Syngenta claims the existence of misappropriated trade secrets in three documents that FBN acquired and/or that Warner or Sleper disclosed: 1) the BreedingPlanCosts document, 2) the Pipeline Proposal, and 3) Sleper's Seed Wishlist. Because the information in these documents is not a readily apparent trade secret, Syngenta relies on the testimony of Dr. Smith to establish that these documents in fact communicate Syngenta's trade secrets. Defendants seek exclusion of Dr. Smith's testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). ECF No. 606. Defendants' motion will be granted.

16

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). District courts have "wide latitude in determining whether an expert's testimony is reliable." *Khoury v. Philips Med. Sys.,* 614 F.3d 888, 892 (8th Cir. 2010) (citation omitted). As long as the evidence indicates that the expert evidence is reliable and relevant, "no single requirement for admissibility" governs.  *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (citation omitted).  But the court must exclude an expert's opinion if it "is so fundamentally unsupported that it can offer no assistance to the jury."  *Id.* at 929–30 (citation omitted).  "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case."  *Marmo*

*v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).   The proponent of the expert opinion bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies Rule 702.  *Khoury*, 614 F.3d at 892 (citations omitted).[3]

a

The BreedingPlanCosts Document

As discussed above, the BreedingPlanCosts document, ECF No. 551-4, is nearly identical to a presentation Warner and Sleper gave to Syngenta leadership before they left the company.  This presentation purported to be a "high level overview" of Syngenta's corn-genetics program.  ECF No. 669-6.  Syngenta now claims, primarily via Dr. Smith's testimony, that this "high level overview" contained five slides or portions of slides that disclosed numerous Syngenta trade secrets.  Because Dr. Smith's opinions relating to the BreedingPlanCosts document are not based on sufficient facts or data and are not the product of reliable principles and methods, they will be excluded.

---

[3]     Rule 702 will be amended as of December 1, 2023, to provide that the proponent bears the burden to "demonstrate[] . . . that it is more likely than not that" the expert's opinion is admissible, including that the "expert's opinion reflects a reliable application of the principles and methods [used] to the facts of the case." *Committee on Rules of Practice and Procedure*, June 7, 2022 Meeting, https://www.uscourts.gov/sites/default/files/2022-06_standing_committee_agenda_book_final.pdf, at 891–92 (last visited Feb. 6, 2023). The amended Rule thus "emphasize[s] that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* at 894.

i

*The GA21*  *Bullet Point*

The bulk of Syngenta's misappropriation claim centers on a bullet point about GA21

█ in the BreedingPlanCosts document. The bullet point states: "Develop █

█████████████████████ (External or Internal) (ie, GA21 █

█ etc.)." ECF No. 618-35 at 2. According to Dr. Smith, this bullet point

communicates Syngenta's confidential work regarding GA21 research and testing. ECF

No. 551-5 ("Smith Rep.") at 30–32. Specifically, this bullet point ostensibly

> incorporates: (1) knowledge of the need to ███ GA21 ████
> (2) knowledge that GA21 ██████ is possible and
> efficacious; (3) knowledge of the means to perform GA21 █
> ████████████ ; and (4)
> knowledge that GA21 ██████ is integral to the
> "vision" of a breeding program utilizing the GA21 trait in
> terms of value.

*Id.* at 31. Dr. Smith asserts that "GA21 ██████ is not publicly known outside

Syngenta," and that through this bullet point, "Warner and Sleper improperly disclosed to

FBN the critical concept of GA21 ██████." *Id.* at 31–32.

Smith's opinions regarding this bullet point are speculative and not tied to any facts

in the record. It is a bridge too far to interpret this bullet point as communicating all of

Syngenta's methodologies for ██████ GA21 █—not even a person skilled in seed-corn

hybrid genomics could read this bullet point and know specifically how Syngenta performs

its GA21 ████████ In other words, there is "too great an analytical gap between the

data and the opinion proffered" for Smith's opinion to be reliable. *Gen. Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997).

There is no dispute that the GA21 trait was well known and in the public domain by 2019, when Warner and Sleper provided the BreedingPlanCosts document to FBN.  *See* Smith Rep. at 30 (stating that GA21 trait is "now available in the public domain").  It seems self-evident that any company wishing to create hybrids using the GA21 trait would recognize the need to ████████████████████████████████████  According to Dr. Smith, however, this particular bullet point did not just communicate the need to ████ GA21 ████ but it also communicated all of Syngenta's trade-secret knowledge regarding how to conduct that ████████████.  In opposition, the Defendants argue that all of this information cannot fairly be implied to this sixteen-word bullet point.  ECF No. 609 at 17.  And while it is true, as Dr. Smith opines, that "the ability to immediately introduce an established and proven ████████████████████ process into its product development pipeline would be of critical value to FBN," Smith Rep. at 30, the contested bullet point says nothing about how Syngenta does that or how Syngenta's process could be replicated.

Syngenta argues that the trade secret at issue is the use of datasets for GA21 ██ ████████ which was not known outside of Syngenta.  But Dr. Smith does not offer that opinion.  Rather, Dr. Smith states more generally that the trade secret at issue is GA21 ██ ████████ "as performed by Syngenta."  *Id.* at 31.

But again, the bullet point does not describe any particular ████████████ protocols, either as Syngenta performs them or otherwise.  Rather, the bullet point generally addresses different aspects of ████ "(ie, GA21 ████████████, etc.)" that would benefit from ████████████ Datasets."  ECF No. 618-35 at 2.  Given that the

20

GA21 trait is public, and that genomics involves a ███████████████ that any specific trait will ████████████████, this bullet point communicated no more than the obvious need to conduct ████████████ on genomic traits and the idea that datasets, something widely used in genomic research, might assist in these ███████ *See Genomics and Data Science: An Application Within an Umbrella*, https://genomebiology.biomedcentral.com/articles/10.1186/s13059-019-1724-1 (last visited Feb. 6, 2023) (discussing the application of data science to genomics). Dr. Smith's opinions regarding this bullet point are overbroad, speculative, and not supported in any way by other record evidence. Dr. Smith will not be permitted to testify that this bullet point communicated Syngenta's trade-secret information.

ii

*Parent Selection*

Dr. Smith next addresses a bullet point on a slide entitled, "How do we Accelerate Genetic Gain?" Smith Rep. at 32. According to Dr. Smith, the statement, "Parents can and should be chosen after ████████ ████████████████████████████████ ███████ ECF No. 618-35 at 3, discloses "Syngenta trade secret information about the timing of the selection of parents." Smith Rep. at 31. This opinion also will be excluded.

There is "too great an analytical gap between the data and the opinion proffered" for Dr. Smith's opinion to be reliable. *Gen. Elec. Co.*, 522 U.S. at 146. Dr. Smith does not offer an opinion that the timing of parent selection is itself a trade secret. Rather, he states that this bullet point communicated Syngenta's methods for parent selection: "Syngenta has developed and utilized ████████████████████████████████████

21

███████████████████████████████████████████.” Smith Rep. at 32. This prediction and scoring led Dr. Smith to conclude that "Syngenta could ██████ ███████████████████████" *Id.* According to Dr. Smith, this bullet point communicates "that ██████████████████████████████████████████ ███████████████████████████.” *Id.* Further, he states it "is not generally known or ascertainable by proper means" that Syngenta makes its parent selection after ████████████. *Id.*

Neither Dr. Smith nor Syngenta contends that the timing of parent-selection generally is a trade secret, and even the challenged statement recognizes an "industry standard" for doing so. While it may be true that others in the industry do not know that Syngenta selects ██████████████████, it cannot be the case that this bullet point communicates Syngenta's practice of selecting parents after ████████████, or that it communicates Syngenta's methods to █████████████████████████████ ███████████████████. This bullet point says nothing about those methods. It merely states that it is ██████████████████████. There are also insufficient facts to indicate that Syngenta consistently selects parents after ████████████. Without any indication that Warner or Sleper also told FBN about Syngenta's "█████████████████ ████████████" methods in conjunction with this bullet point, the bullet point simply does not communicate any trade-secret information. Dr. Smith's proffered testimony to the effect that this bullet point communicated Syngenta's trade-secret information will be excluded.

22

iii

*Heritability*

The next challenged bullet point is on the same slide, under the subheading, "████████████████████████████" ECF No. 618-35 at 2; Smith Rep. at 32–33.  The bullet point reads, ████████████████ ████████████████████████████." ECF No. 618-35 at 2. According to Dr. Smith, this bullet point "improperly discloses Syngenta trade secret information about the fact that Syngenta ████████████████████ ████████████████████████." Smith Rep. at 32.  But Dr. Smith concedes that "the concept of utilizing spatial modeling is commonly understood." *Id.* at 33.  The trade-secret information, according to Dr. Smith, is "what models to use and how to apply them." *Id.*

This bullet point, and indeed the entire BreedingPlanCosts document, does not discuss any particular models or how to apply those models.  As with the previous discussion, the bullet point communicates only information that Dr. Smith concedes is widely known.  Dr. Smith points out that the "Reimagining" presentation from which the BreedingPlanCosts document was drawn discusses specific experimental designs.  *Id.* at 33.  But that discussion is not included in this bullet point or in the BreedingPlanCosts document at all.  More so, the mere fact that Syngenta achieved higher heritability is not the alleged trade secret; what is secret is the process Syngenta used to attain higher heritability.  This bullet point does not contain any description of those methods and therefore it is not a trade secret.  Smith's opinion to the contrary will be excluded.

23

iv

*Number of Hybrids and Inbreds*

Next, Dr. Smith points to two alleged trade secrets in a single slide titled, "Hypothetical R&D Breeding Program for Typical Corn/Soy Market."  ECF No. 618-35 at 5; Smith Rep. at 34.  The first alleged trade secret is in the "Genetic Creation" table, stating that "early stage" corn would require ███ inbreds, and "late stage" corn would require ██ hybrids or varieties.  ECF No. 618-35 at 5.  According to Dr. Smith, this portion of the slide "improperly discloses Syngenta trade secret information about the optimized volume of inbreds in early-stage and hybrids or varieties in late-stage breeding pipelines." Smith Rep. at 33.  Dr. Smith notably does not say that Syngenta has determined that ███ corn inbred lines or ██ hybrid lines are optimal or even preferred.  Rather, he states that Syngenta "has undertaken confidential research efforts to optimize its breeding pipeline, including the number of inbreds and hybrids tested at each stage." *Id.*  But again, the table does not disclose or even reference any specific "research efforts" or "information about the optimized volume."  It just states a number.  Further, the evidence on which Dr. Smith relies indicates that the number of hybrid and inbred lines that Syngenta uses ranges both far above and far below the numbers contained in this bullet point, but nowhere mentions ███ inbred lines or ██ hybrid lines.  ECF No. 611-10.  Dr. Smith's opinion is divorced from the facts of what Syngenta actually does in practice—there is no connection between the facts of the case (Syngenta's optimization volumes) and the bare numbers listed in the tables.  This portion of the slide does not communicate any of Syngenta's trade-secret information, and Dr. Smith's opinion that it does is not admissible.

24

v

*Double Haploid and* ███████████████

Dr. Smith also opines that the entire slide discussed immediately above contains Syngenta's trade-secret information.  Smith Rep. at 35.  According to Dr. Smith, this slide communicates "how to implement Syngenta's data" regarding double-haploid and ████████████████ profiles, protocols, and costs "in the breeding pipeline to accelerate genetic gain."  Smith Rep. at 34.  Dr. Smith does not single out any particular item on this slide as communicating Syngenta's trade secrets in this regard.  Instead, he states that, because both Warner and Sleper "were directly involved in Syngenta's efforts to optimize its double-haploid processes and Sleper also worked on developing and applying genomic selection methods in Syngenta's breeding program," *id.*, this slide told FBN all about Syngenta's proprietary methods for implementing double-haploid and ██████████████ into a breeding plan.

As with all of the other alleged trade secrets in the BreedingPlanCosts document, however, these trade secrets do not appear on this slide.  Dr. Smith offers no principle or methodology that describes how the information in the chart is itself a Syngenta trade secret or even communicates a trade secret.  And the question is not whether Warner and Sleper knew about Syngenta's methods for accelerating genetic gain; they indisputably did.  The question is whether this slide, which contains very general hypothetical numbers for a potential breeding program, improperly communicated that proprietary information to FBN.  Dr. Smith's opinion that it did so is speculative at best and not based on reliable methods at worst.  It will be excluded.

25

b

The Pipeline Proposal

In addition to the BreedingPlanCosts document, Dr. Smith testifies to the parts of the Pipeline Proposal [ECF No. 611-12] that purportedly constitute trade secrets. Sleper co-authored the Pipeline Proposal with an employee of FBN; the document outlines techniques that could be incorporated into a commercial breeding program.

i

█ *locations and* █ *check rate*

The Pipeline Proposal recommends that FBN's first year program use a "█ location and █ experimental design" with that design "[l]ikely" to be a "p-rep design."[4]  *Id.* at 3.  In addition, the proposal recommends "Row-column optimization for checks[5] at █ rate with a minus RM, neutral RM, and plus RM[6] check."  *Id.*  According to Dr. Smith, "use of █ locations in a P-Rep design" is a Syngenta trade secret, as is "use of a █ check rate."  Smith Rep. at 50–51.

---

[4]     "P-Rep" is shorthand for a "partially replicated" trial design.  "P-Rep is a form of experimental design in which a portion of the test entries are replicated, which utilizes less resources in early stage breeding and, when done correctly, leads to higher selection accuracy."  Smith Rep. at 50.

[5]     A "check" in this context is a control group, in which a known seed line is included in the new test lines for comparison purposes.  Kaeppler Rep. [ECF No. 604-1] ¶¶ 125–26.

[6]     Although the parties do not define the term, an internet search reveals that RM stands for "relative maturity," which "is determined by comparing grain moisture of hybrids at harvest."  *Optimum Relative Maturity for Yield and Profitability in Corn*, http://corn.agronomy.wisc.edu/AA/A039.aspx (last visited Feb. 7, 2023).  It does not appear that Syngenta claims the reference to RM as a trade secret.

The Defendants first argue that Dr. Smith is not qualified to offer any opinions regarding P-Rep trial designs because he admits that he had no previous knowledge of such trials and merely read "four or five" publicly-available papers about it.  ECF No. 611-1 ("Smith Dep.") at 178.  Thus, Dr. Smith's opinion that the use of ▮▮ locations is not generally known is beyond Dr. Smith's expertise.

The Defendants are likely correct that Dr. Smith is not qualified to offer opinions about what is and is not widely known regarding P-Rep trials. *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (holding that the engineering expert was not qualified because, despite the application of universal engineering principles, he never worked on the design of the specific product in question); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (finding an "eminently qualified" expert in one area does not make that person an expert in other specific practices); *Brotherhood Mut. Ins. Co. v. ADT, LLC*, No. 13-cv-1870 (DSD/JJK), 2014 WL 2993728, at *2–4 (D. Minn. July 2, 2014); *Astro Tech., Inc. v. Alliant Techsystems, Inc.*, No. H-03-0745, 2005 WL 6061803, at *6–9 (S.D. Tex. Sept. 28, 2005); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1037 (S.D. Cal. 2021).

But there is a more fundamental reason why his opinion in this regard is inadmissible: it is not tied to the facts of this case or any reliable methodology.  Dr. Smith compared the "Reimagining" presentation that Warner and Sleper prepared for Syngenta, which mentions using ▮▮ locations for P-Rep trials, and from that presentation concludes that the use of ▮▮ locations is a Syngenta trade secret.  At the same time, he concedes that other Syngenta documents recommend using ▮▮ locations, Smith Dep. at 180, and that

27

he did not see any other Syngenta documents recommending ███ locations.  *Id.*  Dr. Smith's determination that the use of ███ locations in a P-Rep trial design is a Syngenta trade secret is not supported by his expertise, his research, or the evidence in this case and will be excluded.

The same is true for the ███████ check rate.  Dr. Smith's conclusion that this check rate is a Syngenta trade secret comes solely from the "Reimagining" presentation, which recommended a check rate of "███ of total plots." ECF No. 669-7 at 15.  Dr. Smith states that "based on [his] review of public literature," which he concedes was limited to "four or five" documents retrieved after searching the internet for the term "P-Rep," a ███ ███ check rate is "not generally known or readily ascertainable."  Smith Rep. at 51; ECF No. 618-26 at 199.  ███ Dr. Smith testified that he did not see any other documents from Syngenta setting ███████ as the optimal check rate, Smith Dep. at 193, ███ ███████ literature in the public domain recommended use of a ███████████ check rate.  *Id.* at 200.  Syngenta's sole argument in opposition to the motion to exclude this opinion is that Syngenta included this alleged trade secret in its Identification.  Merely claiming that something is a trade secret does not make it so, however.  Dr. Smith's opinion that a ███████ check rate is a Syngenta trade secret is unsupported and as a result is inadmissible.

ii

*Optimization*

Defendants challenge another bullet point in the Pipeline Proposal, which states, "Optimization: predict GCA with hybrid model, calculate variance, and ███████

28

████████ for agronomics and trait packages."  ECF No. 611-12 at 2.  In his report, Dr.

Smith states that this bullet point "discloses concepts and conclusions derived from

Syngenta's trade secret analysis of ██████ and ████████████████ traits."  Smith

Rep. at 46.   This analysis allows Syngenta "to better pre-screen inbreds to avoid

unnecessary development costs of lines that will likely ultimately fail, decrease overall

development cost, and produce lines more efficiently."  Smith Rep. at 47.

Dr. Smith points to three trade secrets in Syngenta's Identification that this bullet

point purportedly encompasses.  The first two are Syngenta's



[d]ata, analysis, methodologies, and modeling utilizing
Syngenta's historic data to create and evaluate the best inbred
and hybrid lines, including:  . . . (b) Syngenta's

. . . ; and (c) Syngenta's

ECF No. 551-12 ¶ 8(b)–(c).  The third is "[d]ata, analysis, methodologies, data quality

control procedures, and modeling related to or reflecting Syngenta's use of ████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ " *Id.* ¶ 9(h).  According

to Dr. Smith, because Sleper developed "████████████████████████ during his

time at Syngenta," Smith Rep. at 45, this bullet point must have been based on and

communicated that trade-secret information.

The Identification's general description of "data, analysis, and methodologies" does not specify any particular analysis or methodology that might be a trade secret. At most, the alleged trade secrets point to proprietary "█████████████████" and various models that Syngenta uses to predict genetic risk. The bullet point does not mention any of these alleged proprietary methods, merely stating in general terms the self-evident need to develop a methodology to "█████████████ for agronomics and trait packages." Dr. Smith's opinion that this bullet point communicated Syngenta's trade secrets to FBN is speculative and inadmissible as such.

iii

*DH Families*

Another bullet point in the Pipeline Proposal outlines early-stage preliminary testing for double-haploid, or DH, hybrids. The challenged bullet point describes the ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ ECF Nos. 611-12 at 2. Dr. Smith asserts that, in this section of the Proposal, "Sleper is telling FBN to use genomic selection ███████████████████████████████████." Smith Rep. at 47. Dr. Smith ties this alleged disclosure to recommendations that Sleper and Warner made in the BreedingPlanCosts document and the "Reimagining" presentation. Specifically, Dr. Smith points to the Reimagining presentation's demonstration that

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[REDACTED]

Smith Rep. at 47.  Because Sleper took the Reimagining presentation with him when he left Syngenta and had it when he created the Pipeline Proposal, Dr. Smith's reasoning goes, the Pipeline Proposal must have communicated Syngenta's trade secrets.

Whether the Reimagining presentation contained Syngenta's trade secrets is not the issue in this case, however.  There is no allegation that Sleper or Warner provided the Reimagining presentation to FBN.  The implication of Dr. Smith's opinion is that, because Sleper knew how Syngenta conducted its genomic selection, any description of any genomic-selection process, no matter how general, must have encompassed Syngenta's trade secrets.  But whether Sleper developed the Pipeline Proposal using trade secrets is a different question than whether that Pipeline Proposal communicated those trade secrets to FBN for purposes of Syngenta's misappropriation claim against FBN.  Any opinion that this section of the Pipeline Proposal communicated Syngenta's trade secrets is therefore speculative and admissible.

iv

*Production Research Traits*

The Pipeline Proposal also recommends that early-stage preliminary testing include "[REDACTED]."  ECF No. 611-12 at 3.  Dr. Smith opines that this portion of the Proposal

31

"discloses concepts and conclusions derived from Syngenta's trade secret analysis of

███████████." Smith Rep. at 49. █████████████████████████████████

████████████████████████████████ t," and include the traits mentioned in this

portion of the Pipeline Proposal. *Id.* at 48.

Again, however, whether the "concepts and conclusions" are "derived from"

Syngenta's trade secrets is a different matter than whether those trade secrets were actually

disclosed. And as discussed with respect to other challenged statements above, that a

hybrid program might evaluate traits such as tassel size, plant height, and the like, is too

self-evident to be a trade secret. This portion of the Proposal does not outline any methods

for evaluating these traits; it merely recommends evaluating them. Dr. Smith's opinion

that this bullet point communicates Syngenta's trade-secret methods and analysis is another

leap-too-far, and this opinion is therefore inadmissible.

v

*BLUP/GBLUP Analysis*

Finally, the Pipeline Proposal recommends that in "Early Year 1," the development

program perform a "[████████████████████████████████████████

████████████ ███████████████████████." ECF No. 611-12 at 3. Dr. Smith

acknowledges that the Proposal cites to public sources to support this analysis, but he

opines that "integrating these tools together for data analysis" is not disclosed in the public

sources and is a Syngenta trade secret. Smith Rep. at 49. Dr. Smith also believes that the

---

[7]      "BLUP" means "best linear unbiased prediction." Smith Rep. at 29. Dr. Smith's
report does not define what GBLUP means; presumably, it is related to BLUP.

"stacking" of these analytical tools is "economically valuable to Syngenta because of its potential to increase prediction accuracy of certain traits, thereby leading to better selections of seed lines." *Id.* Because Sleper had himself recommended the stacking analysis, and because Sleper allegedly "stole" files and other documents from Syngenta that outlined Syngenta's genomic selection data, Dr. Smith opines that Sleper and FBN "could [have] use[d] that information" to develop the desired traits more rapidly. *Id.* at 49–50.

But this bullet point says none of that. The bullet point recommends using three different, publicly available, analytical tools to evaluate new hybrid lines. It says nothing about the reasoning or importance of using the tools in tandem. Neither does Smith point to evidence that Syngenta actually uses this "stacking" process. Smith's opinion is speculative and inadmissible.

c

The Seed Wishlist

In addition to the BreedingPlanCosts document and the Pipeline Proposal, Defendants also challenge Dr. Smith's opinions about Sleper's "Seed Wishlist." Sleper prepared a list of seed lines he recommended to FBN as its starting place for a breeding program. ECF No. 618-50. Out of the 84 publicly available lines Sleper recommended that FBN purchase, eight of them had been Syngenta's proprietary lines before the patents

or other protections on those lines expired.[8]   *Id.*   According to Dr. Smith, the only explanation for Sleper including these Syngenta lines among the lines he recommended is that Sleper used Syngenta trade secrets to produce the list.   Smith Rep. at 52.

Dr. Smith did not himself examine Syngenta's seed lines to determine whether any of the lines Sleper chose were included in Syngenta's "best" lines—lines "that have had the most use to make commercial hybrids."   Smith Dep. at 274.   Instead, a Syngenta employee, Dr. Rita Mumm, compared Sleper's chosen Syngenta seed lines with Syngenta's "code book," and then in turn determined whether those lines were included in Syngenta's "best lines list."[9]   *Id.* at 272–74.   Dr. Smith concedes that not all of the Syngenta lines Sleper chose are included on this list, *id.* at 274–75, but insists that, for five of the Syngenta lines Sleper chose, public information would not have revealed the lines' important value to Syngenta's breeding program. ECF 644 at 43.   Because Sleper selected lines for which public information was lacking, Smith opines that Sleper must have relied on Syngenta's trade-secret information in making those selections.   Smith Dep. at 278.

---

[8]     Syngenta also contends that the list contains lines from Holdens that Syngenta had "used internally."   ECF No. 644 at 39.   It is unclear whether Syngenta claims that these Holdens lines are somehow Syngenta trade secrets.

[9]     The Defendants argue that Dr. Smith's reliance on Dr. Mumm, who will not testify in this case, is inappropriate and warrants exclusion of Dr. Smith's opinions on the seed wish list.   It appears that Dr. Mumm's contribution was limited to data analysis. Defendants do not contend, for example, that she erroneously categorized the seed lines at issue, and such categorization is more akin to ministerial, rather than executive, expert-witness duties.   Moreover, "arguments about the reliability of the analysis go to weight rather than admissibility." *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 950 (D. Minn. 2020).   Exclusion of Dr. Smith's opinions on this basis is not warranted.

But Dr. Smith acknowledges that Sleper did not include several of Syngenta's most successful lines, as would be expected if Sleper indeed relied on Syngenta's trade secrets. Further, several of the Syngenta lines Sleper selected were not on the "best lines" list, and thus Sleper's choice of those lines rebuts any suspicion that he used Syngenta's trade secrets. The fact that Sleper chose five of Syngenta's successful lines among the 84 total lines he chose, or even among the eight Syngenta-specific lines he chose, could certainly be attributed to improper use of Syngenta's confidential information, as Dr. Smith contends, or it could be attributed to chance or luck or entirely public information. Dr. Smith's opinion that "the only explanation" is use of Syngenta trade secrets is both a factual and logical leap.

Dr. Smith claims to have a smoking gun, though. For one of the Syngenta lines Sleper chose, Sleper noted, "Think is ███████." ECF No. 618-50. ████████ is Syngenta's internal code for one of its successful hybrid lines. According to Dr. Smith, the success of this particular hybrid is not well-known outside of Syngenta. Smith Rep. at 63. This reference is the only direct evidence Syngenta has that Sleper might have used Syngenta's confidential information in formulating the seed list.

Even if the use of Syngenta's internal code is evidence that Sleper was relying on Syngenta's confidential information, there is nothing to tie Sleper's actual seed choices to any trade-secret misappropriation. At most, Dr. Smith's opinion is that he reviewed the public information Sleper relied on, and Dr. Smith would not have made the same seed selections that Sleper did based on that information. But Sleper has expertise and agency in this exercise. Had he selected 10 Syngenta lines, all of which were Syngenta's best

lines, it could fairly be inferred that he misappropriated confidential information.  That he selected eight lines, just over half of which were on the best-lines list, does not suggest misappropriation as Dr. Smith describes.  Dr. Smith's opinion that the seed list must be the product of misappropriation is speculative.  It is, as the Defendants say, a conclusion in search of support.  Dr. Smith is not of course required to discount every possible reason Sleper might have chosen the seeds he chose, but his opinion that the choices reflect misappropriation must be based on something more than "Sleper had access to information about Syngenta's best lines and some of the lines he chose are among the best lines."

What is not speculative, however, is the process by which an expert in this industry would go about selecting seed lines to start a breeding program.  Dr. Smith, as a corn seed breeding expert, is free to testify about best practices in the industry and the factors that he would consider in selecting lines.  He may explain the reasons that make a line desirable for breeding or the information that a person would rely on when choosing a line.  He may even opine that he would have selected different lines than Sleper did based on the information available to Sleper at the time of his selection.  It is a step too far, though, to assert that Sleper must have misappropriated trade secrets because Dr. Smith does not understand why Sleper chose certain lines or because Dr. Smith's list would have been different.  Dr. Smith's opinions are inadmissible in this respect.[10]

---

[10]   Defendants move to preclude Dr. Smith from testifying from the factual narrative section of his report.  These facts, according to the Defendants, are mere restatements of Syngenta's litigation position and are not based on any expert methodology or the like. Syngenta responds that Dr. Smith cannot be precluded from testifying to relevant background information.  Because Dr. Smith's testimony regarding the existence of trade secrets is excluded, there is likely no need for him to testify at all.  Should Syngenta wish

2

Dr. Smith's exclusion doesn't end the analysis. In addition to his proffered testimony, Syngenta relies on several other items of record evidence to show that it may succeed at trial on its trade-secret-misappropriation claims. *See* ECF No. 654. None do.

a

Declaration of Shreyartha Mukherjee

Syngenta relies on the declaration of Shreyartha Mukherjee, claiming that the ███████ file names reflect a line and tester combination, which enables Syngenta to predict the success of seed lines. *Id.* at 14. Defendants move to strike this declaration [ECF No. 668], arguing it is procedurally improper. Syngenta submitted the declaration with its Memorandum in Opposition to Defendants' Motion for Summary Judgment. ECF No. 654 at 14–15. The purpose of Mukherjee's Declaration was to explain "(a) what ███████ files are; (b) what information can be ascertained from ███████ files; and (c) what ███████ files were used for within Syngenta." ECF No. 668 at 3. Defendants argue that this Declaration "belatedly purports to offer new facts, well beyond the deadline for disclosure, about the ███████ files Defendant Joshua Sleper developed and allegedly wrongly retained after leaving Syngenta." ECF No. 705 at 5.

At the time of his Declaration, Mukherjee was a Global Support Data Analyst for Syngenta, where he was "primarily responsible for developing prototypes of new analytical tools to help with plant breeding decisions, serving as a subject matter expert on genetics

---

to present his testimony to provide helpful background information to the jury in a manner consistent with Rule 702, however, it may do so.

projects, and acting as a liaison between Syngenta's research and development and IT groups."[11]  Mukherjee's Declaration explains that he was the author of the ████████ files, how he created them, the significance of the files' names, and the value the files provided to Syngenta.  ECF No. 668 at 3–7.

The problem is that Defendants sought this information through several interrogatories, and Syngenta failed to provide any of the now-disclosed information.  For example, Defendants asked Syngenta to identify the persons most knowledgeable on each alleged trade secret, to describe all persons participating in the alleged trade secrets, and to describe the authorship and development of each alleged trade secret.  ECF Nos. 708-1 at 6–7 (Interrogatory No. 1), 20 (Interrogatory No. 2); 708-2 at 6 (Interrogatory No. 8). Syngenta did not list Mukherjee in its response to any of those interrogatories.  In fact, Syngenta only mentioned Mukherjee once in its response to Defendants' interrogatories, under Interrogatory No. 4, by including him at the end of a list of people who "have further information regarding the development of Syngenta's trade secret information."  ECF No. 708-1 at 115.  Syngenta never explained Mukherjee's connection to the ████████ files even though his authorship and involvement with the files would have been directly responsive to Interrogatory No. 2.  *See* ECF No. 708-1 at 20, 74–75, 98.  Syngenta's one-time mention of Mukherjee in its interrogatory answers and Sleper's brief reference to Mukherjee in his deposition [ECF No. 665-02 at 64] are insufficient to identify Mukherjee as someone who had the level of knowledge he later expressed in his Declaration.  Because

---

[11]     It is unknown whether Mukherjee is still in that role or employed by Syngenta.

Syngenta did not properly disclose this information in discovery, it cannot now use it as evidence.  Fed. R. Civ. P. 37(c).

b

Warner's Deposition Testimony

Syngenta cites Warner's deposition testimony to assert that "Warner admitted that Wulfkuhle may have brought up the risks associated with ███, information Warner knew to be confidential to Syngenta" and "that the BreedingPlanCosts document contains Syngenta confidential information."  ECF No. 654 at 20–21.  The cited testimony might reasonably be construed to support the first proposition.  It cannot reasonably be understood to support the second.  Nowhere in the cited testimony does Warner state that the BreedingPlanCosts document contains or is itself Syngenta confidential information. Regardless, characterizing or labeling information as "confidential" in the way Warner is alleged to have done falls short of raising a fact question as to whether the document or information in it is a trade secret.

c

The LaCie Drive

Syngenta claims "[f]orensic analysis revealed that the LaCie Drive contained nearly 2,000 Syngenta trade secret documents," citing the Identification and the deposition testimony of Tucker, a Syngenta 30(b)(6) witness.  ECF No. 654 at 27.  The documents referred to are the ██████ files.  While Syngenta calls them trade secret documents here, there is still no explanation or evidence that they are in fact trade secrets, and Tucker's deposition testimony does not establish that either.  *See* ECF No. 551-15 at 73–75, 241,

244.    Tucker asserts that "[t]he breeding plan document . . . contained confidential information, trade secret information for Syngenta." *Id.* at 74.  But neither the cited deposition testimony nor Syngenta's brief expands on why or how the document allegedly contains trade secret information.

d

Bostwick and Ford's Deposition Testimony

Syngenta cites, but does not meaningfully discuss, another of its Rule 30(b)(6) witnesses' depositions, Bostwick, for its assertion that "Syngenta's witnesses testified that Syngenta does not share information about its ███████ assessment with growers or anyone outside of Syngenta." *Id.* at 47.  Bostwick's deposition testimony is helpful in explaining what Syngenta means by "████████"—which is essentially all the research Syngenta has done to understand the molecular mechanism behind the performance of the ████████ trait—and Bostwick's testimony supports Syngenta's assertion that this information is confidential.  ECF No. 665-3 at 351–53.  This testimony does not, however, show either that this information is a trade secret or was the subject of disclosure or use.  Syngenta also relies on Bostwick and Ford, another Syngenta 30(b)(6) witness, to support the following two statements: "These words—████████████████████ for '████████'—mean . . . there is a ███████ ███ ████████████████████████████████████████ ████████████████████████████████ a definition known by the drafters of the document only because of their time at Syngenta" and "Other Syngenta witnesses also described Syngenta's ████ ████████████ trade secrets, the disclosures in the BreedingPlanCosts document, and how that information is not publicly known."  ECF No. 654 at 47–48.  But

the cited testimony does not support these propositions. *See* ECF Nos. 673-3 [Bostwick Dep.] at 75–79, 673-4 [Ford Dep.] at 97–98, 100–02. The testimony just says that Dyer, Warner, and Sleper would have knowledge about GA21, which is undisputed. And while Ford states, "[he's] not aware that the conclusions or the inference that GA21 ████ has a ████████████████████████████████████████████████████████████████ ██████," his testimony is discussing *databases*—his testimony does not communicate that ███████████████████ are unknown generally. ECF No. 673-4 at 101. More so, Bostwick did not deny "that there's [] ample published literature about the use of genomic prediction to [] ███████████████████████████████ [GA21 and similar] types ██████████ ECF No. 618-36 at 57.

e

The Identification

Syngenta repeatedly relies on the Identification as the evidence supporting the information's trade-secret nature. *See* ECF No. 654 at 27, 45, 49, 56. As discussed earlier, Syngenta's obligation to particularly identify its trade secrets (as required by Magistrate Judge Thorson via the Identification) is different than its obligation to prove the existence of a trade secret. The Identification is not evidence.

*

Syngenta has thus failed to demonstrate any genuine issue of material fact as to the existence or misappropriation of a trade secret, and its trade-secret claims fail. Because the conspiracy claim is entirely derivative of the trade secret claims, it is not trial-worthy, either.

41

IV

The entry of summary judgment against its trade-secret-misappropriation claims leaves Syngenta with essentially four claims against Warner. Three of these are breach-of-contract claims under (three) different sections of Warner's Syngenta employment agreement: a non-compete term (§§ 5(c), 13), a nondisclosure term (§ 6(a)), and a return-of-property term (§ 14(a)). Syngenta's fourth claim is for tortious interference with contract. Both Warner and Syngenta seek summary judgment. Warner ostensibly seeks summary judgment outright—that is, as to all four of these claims. Syngenta seeks summary judgment in its favor with respect to liability on its claim under the return-of-property term.

A

At the outset, Warner's motion fails an important procedural hurdle: he did not mention either Syngenta's claim under the non-compete term or its claim for tortious interference with contract in his opening summary judgment brief. *See* ECF No. 566. Issues not raised in an opening brief ordinarily are considered waived. *See Gareis v. 3M Co.*, 9 F.4th 812, 819 n.4 (8th Cir. 2021); *ARP Wave, LLC v. Salpeter*, No. 18-cv-2046 (PJS/ECW), 2021 WL 168501, at *19 n.31 (D. Minn. Jan. 19, 2021). This rule has particular significance in the summary-judgment context. Rule 56(a) places the burden on the movant to show there is no genuine dispute as to any material fact entitling the movant to summary judgment, and "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *Safeway Transit LLC v. Discount Party Bus, Inc.*, No. 15-cv-3701 (JRT/HB), 2017 WL 8947190, at *17 (D. Minn. July 31, 2017) (declining to grant summary judgment when the moving party "provide[d] no case law or legal analysis whatsoever in support of their request for summary judgment"). Warner identifies no reason why his failure to address these two claims in his opening brief should be excused here. Therefore, on this procedural basis, Warner's motion will be denied with respect to Syngenta's claim for breach of contract under the non-compete term of Warner's Syngenta employment agreement and its claim for tortious interference with contract.

## B

Turn, then, to the two remaining contract claims under the nondisclosure and return-of-property terms. Section 15(c) of Warner's employment agreement states that the agreements "shall be subject to and governed by the substantive laws of the State of North Carolina." ECF Nos. 552-2. The Parties do not dispute that North Carolina law governs these claims. To prove a breach of contract under North Carolina law, Syngenta must establish the "(1) existence of a valid contract and (2) breach of the terms of the contract." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 472 (N.C. 2019) (quotation omitted); *McElmurry v. Alex Fergusson, Inc.*, No. 1:04CV389, 2006 WL 572330, at *11 (M.D.N.C. Mar. 8, 2006); *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).[12] "The

---

[12]     Warner argues a breach of contract claim under North Carolina law also requires proof of injury. While the North Carolina case law is somewhat ambiguous on this issue,

plaintiff need not prove actual injury, and proof of the breach entitles the plaintiff to nominal damages, even without proof of actual damages." *Inmar Brand Sols., Inc. v. Infinity Sales Grp., LLC*, 1:18-CV-761, 2019 WL 5597894, at *6 (M.D.N.C. 2019); *see Bryan Builders Supply v. Midyette*, 162 S.E.2d 507, 511–12 (N.C. 1968). North Carolina law requires the breach to be material, "that is, one that substantially defeats the purpose of the agreement or that goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *McElmurry*, 2006 WL 572330, at *11; *Supplee v. Miller-Motte Bus. Coll., Inc.*, 768 S.E.2d. 582, 593 (N.C. Ct. App. 2015).

1

Warner seeks summary judgment with respect to Syngenta's breach-of-contract claim under the nondisclosure term of his employment agreement. This term reads as follows:

> Employee covenants and agrees that (i) the Employee shall keep and maintain the Confidential Information in strictest confidence, *and* (ii) the Employee shall not, except as required in work assigned Employee by the Company, directly or indirectly, use for Employee or for others, or publish, or disclose to any third party any information, knowledge or data relating to the Company, its predecessors or affiliates or to any third party business contact of the Company, such as a customer or potential customer of the Company, as well as any other information, knowledge or data owned by, controlled by or in the possession of the Company, its predecessors or affiliates (whether or not utilized by the Company, its predecessors or affiliates and whether or not obtained, acquired or developed by Employee) or disclosed to the Company, its predecessors or affiliates or Employee by a third party during

_____

the North Carolina Supreme Court's 2019 opinion, *Link*, 827 S.E.2d at 472, did not include proof of injury or damages as an element of a breach of contract claim under North Carolina law.

the term of employment with Company or any of its
predecessors or affiliates.

ECF No. 552-2 at 4–5 (emphasis added).  Warner's employment agreement defines

"Confidential Information" by incorporating the definition of that term appearing in the

Syngenta "Confidentiality and Proprietary Rights Agreement."  *See* ECF No. 552-4 at 3, §

4.  There, "Confidential Information" is defined quite broadly and at some length:

> During the term of employment, and thereafter, Employee will
> not, except as required in work assigned Employee by the
> Company, directly or Indirectly, use for Employee or for
> others, or publish, or disclose to any third party any
> information, knowledge or data relating to the Company, its
> predecessors or affiliates or to any third party business contact
> of the Company, such as a customer or potential customer of
> the Company, as well as any other information, knowledge or
> data owned by, controlled by or in the possession of the
> Company, its predecessors or affiliates (whether or not utilized
> by the Company, its predecessors or affiliates and whether or
> not obtained, acquired or developed by Employee) or disclosed
> to the Company, its predecessors or affiliates or Employee by
> a third party during the term of employment with Company or
> any of its predecessors or affiliates (hereinafter "Confidential
> Information").  Confidential Information includes, but is not
> limited to: product or service information, including product
> formulations; fees, costs and pricing structures; distribution
> and sales methods and systems; sales and profit figures:
> marketing information; advertising and pricing strategies;
> analyses; diagrams; reports; computer software, including
> operating systems, applications, and program listings; flow
> charts; manuals and documentation; databases; accounting and
> business methods; business plans; innovations, designs, ideas,
> inventions and new developments and methods, whether
> patentable or unpatentable and whether or not reduced to
> practice; trade secrets; manufacturing know-how; raw material
> and product specifications; analytical techniques; quality
> control tests and procedures; proprietary information;
> customer lists; existing and prospective clients, distributors,
> agents, suppliers and customers and other information related
> thereto; and all similar and related information in whatever

form.  It is agreed that the above obligations shall not apply to
(a) any Confidential Information that is now publicly available,
(b) any Confidential Information that subsequently becomes
publicly available other than by a breach of this Agreement or
other than by a breach of any confidentiality agreement with a
predecessor or affiliate of the Company or (c) any Confidential
Information that Employee receives free of any obligation of
confidentiality or restrictions on use from a third party after
termination of employment with the Company.

ECF No. 552-4 at 3, § 4.

A reasonable jury could determine that Warner breached the nondisclosure term of
his employment agreement, as that term is defined by reference to § 4.  Though the
provision's precise meaning might be debatable, as it defines "Confidential Information"
quite broadly to include matters that go far beyond the coverage of the DTSA and the
NCTSPA.  But the failure of these statutory claims does not preclude Syngenta from
showing that its contract claims are trial-worthy.[13]  And for this motion's purposes, it is
enough that Syngenta—in its opposition brief—identified a significant volume of record
evidence from which a reasonable juror could infer that Warner used Syngenta information
for his benefit, *see* ECF No. 626 at 28–31, and Warner did not meaningfully address this
evidence in reply, *see* ECF No. 684 at 4–5.

Warner argues that the phrase appearing at the end of the nondisclosure provision,
"during the term of employment with Company," limits enforcement of this provision to
Warner's conduct while he was employed by Syngenta.  Since Syngenta's allegations only

---

[13]     It probably doesn't matter, but it seems potentially problematic that "Confidential
Information," as that term is used in § 6(a)(i) of the nondisclosure provision, is defined by
a provision that incorporates § 6(a)(ii).  Accepting that approach seems to blur any
distinction intended between those two subsections.

involve Warner's conduct after his employment ended, he argues, the nondisclosure provision does not apply.  This is not persuasive.  Syngenta's "use" theory depends on evidence tending to show Warner's conduct during his Syngenta employment.

2

Warner and Syngenta seek summary judgment with respect to Syngenta's claim under the return-of-property provision.  This provision appears in § 14(a) of Warner's employment agreement and, generally speaking, required Warner to return certain documents to Syngenta upon the termination of his employment.  ECF No. 552-2 at 7.  It reads:

> Upon termination of employment, Employee shall deliver to the Company all materials and copies thereof, including, but not limited to, writings, records, data, photographs, memoranda, manuals, handbooks, contracts, orders, sales literature, price lists, customer lists, data processing materials, software programs, manufacturing and production materials and any other documents, whether or not obtained from the Company, which pertain to the Company, contain Confidential Information or were received or used by Employee in connection with employment by the company.

*Id.*

Warner challenges the validity of this provision.  He argues that it is unenforceable because it is void under Minnesota's anti-wage-theft statute, Minn. Stat. § 181.79.  This argument is not persuasive.  As a procedural matter, any affirmative defense regarding the illegality of this provision should have been raised in the Answer; because it was not, it is waived.  Fed. R. Civ. P. 8(c)(1); *see Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 908–09 (8th Circuit 2010); *Rundgren v. Bank of New York Mellon*, 777 F. Supp. 2d

1224, 1233 (D. Haw. 2011) ("[I]llegality and/or unenforceability is an affirmative defense and not a claim for relief."), *aff'd*, 637 Fed. App'x 404 (9th Cir. 2016).  That issue aside, the employment agreement is governed by North Carolina law.  It is therefore difficult to understand how a Minnesota statute might apply, and Warner has not identified a North Carolina statute under which he might advance a similar argument.

The record leaves no room for dispute that Warner violated his obligations under this provision.  Warner did not return Syngenta documents stored on several external hard drives upon termination of his employment.  Warner used these external hard drives, in addition to his Syngenta desktop, laptop, and cell phone, to facilitate his work while at Syngenta.  Throughout his employment, Warner used at least seven external hard drives. For example, on February 12, 2020, Warner transferred a Syngenta file, the "Drought File," from his Syngenta desktop to one of his external hard drives, the Alcor Micro Drive.  ECF No. 593-1 ¶¶ 77–83.  About a month later, on March 13 and 16, 2020, Warner moved files between his Syngenta laptop and five of his external hard drives.  *Id.* ¶¶ 68–73.  Warner's last day of employment with Syngenta was May 15, 2020.  Thus, according to his employment agreement, Warner was required on that day to return all materials covered by Section 14(a).  On May 15, his last day of employment, he returned his Syngenta laptop, Syngenta phone, and one external hard drive.  On May 29, Syngenta emailed Warner asking about his external drive usage based on its suspicion that Warner had outstanding Syngenta materials.  ECF No. 552-33.  On June 8, Syngenta's counsel held a video call with Warner to again ask whether he had any other unreturned devices that contained Syngenta documents or information.  ECF No. 551-3 at 169.  During neither the email

exchange nor the video call did Warner mention anything about the six other external drives he possessed, all of which contained varying amounts of Syngenta information. ECF Nos. 551-10, 551-16. Then on July 2, 2020, nearly two months after his Syngenta employment ended, Warner "returned every device in his possession" except for his personal cell phone to Syngenta's counsel. ECF Nos. 631 at 4, 551-3 at 151, 173. The Parties do not dispute that Warner had in his possession six external hard drives that contained Syngenta documents after his employment with Syngenta ended. ECF No. 551-3 at 145–46, 202.

Warner identifies a fact dispute as to whether he was aware of the Syngenta property he retained post-termination. He says that evidence shows he forgot about the drives or did not realize the materials were still accessible on the drives, and he argues that his lack of awareness or intent means he did not breach § 14(a). "Contract liability is strict liability." *Citgo Asphalt Refining Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1089 (2020); Restatement (Second) of Contracts § 261 Introductory Note. Warner cites no authority to support the proposition that lack of knowledge or subjective intent excuses him from performing under his employment agreement or § 14(a) specifically. Therefore, his subjective awareness is immaterial to whether he breached this provision.

Warner also suggests that the documents he retained do not fall under Section 14(a)'s requirements. It is clear that they do. Section 14(a) of the Employment Agreement does not prohibit only the retention of confidential information as that term is commonly understood, as Warner argues. It also prohibits the retention of "all materials and copies thereof . . . which *pertain to the Company*, contain Confidential Information or *were*

*received or used by Employee in connection with employment by the Company*."  ECF No.
552-2 at 7 (emphasis added).  It is undisputed that the Syngenta documents on Warner's
external hard drives "pertain" to Syngenta and were "received or used by" Warner "in
connection with" his employment by Syngenta.  Warner admitted that he did not use the
devices for anything other than working for Syngenta.  ECF No. 551-3 at 158–59, 173–74,
207–08; ECF No. 566 at 7.  In other words, Warner used the devices solely for work
"pertain[ing] to the Company" and "in connection with [his] employment by the
Company," which puts the devices squarely in the category of materials covered by Section
14(a).

Warner argues that "Syngenta's ignorance of its exit procedures should be deemed
a waiver of the provisions it now seeks to enforce."  ECF No. 631 at 7.  This argument is
not persuasive because Syngenta's exit procedures (or alleged lack thereof) do not affect
Warner's obligations under his employment agreement.  Regardless, there is insufficient
evidence in the record to establish that Syngenta waived § 14(a)'s requirements.  And even
if the record contained evidence of waiver, the employment agreement contained an anti-
waiver provision.  ECF No. 552-2 § 15(d).

There is no dispute as to any material facts that Warner kept Syngenta materials
after his termination.  By failing to return Syngenta materials upon his termination, Warner
materially breached Section 14(a).  Syngenta's motion for summary judgment on its breach
of contract claim under Section 14(a) against Warner will be granted.  As there is no record
evidence regarding Syngenta's alleged damages resulting from Warner's breach of
contract, that issue remains a question for the jury.

V

As with Warner, Syngenta seeks summary judgment affirmatively with respect to liability on its failure-to-return-property/breach-of-contract claim against Sleper.  (Unlike Warner, Sleper did not independently seek summary judgment.)   This motion will be granted, also.

In his deposition, Sleper testified that he permanently deleted documents from the LaCie drive.  ECF Nos. 648 at 20, 665-2 at 82–86.  Included in those documents were "four Excel spreadsheets containing publicly available PVP patent information," and those "Excel spreadsheets . . . are Syngenta documents."  ECF Nos. 648 at 20, 665-2 at 83; *see also* ECF No. 532 at 15 n.11 (Magistrate Judge Thorson finding "that [i]t is undisputed . . . that the four Excel spreadsheets contained Plant Variety Protection information and are *Syngenta documents*") (emphasis in original), 435-11 at 2, 551-20.  And Sleper admits that Magistrate Judge Thorson "concluded that [he] destroyed Syngenta information."  ECF No. 648 at 21.  That is enough to establish Sleper's liability under § 14(a).

Sleper argues—as did Warner—that he could have breached § 14(a) only if the deleted information was confidential.  *Id.* at 20-21.  Section 14(a) is not limited to Syngenta's confidential information.  By admitting to destroying, and thus retaining, "any [] documents which pertain to [Syngenta], . . . or were received or used by Employee in connection with employment by [Syngenta]," Sleper admitted to breaching Section 14(a), making the entry of summary judgment against him on this basis appropriate.

51

VI

In addition to Defendants' Motion to Exclude Testimony from Dr. Smith, there are five other motions to exclude expert testimony: Syngenta's Motion to Exclude Testimony and Opinions of Dr. Shawn Kaeppler [ECF No. 597]; Syngenta's Partial Motion to Exclude Testimony and Opinions of Jerry Bui [ECF No. 555]; Defendants' Motion to Exclude Testimony from Robert Meekins [ECF No. 588]; Defendants' Motion to Exclude Testimony from Donald Gorowsky [ECF No. 574]; and Syngenta's Motion to Exclude Bone Projections [ECF No. 568]. The motions will be addressed in that order.

A

Dr. Shawn Kaeppler is Defendants' technical expert focused on the trade secret evidence relating to Syngenta's trade secret misappropriation claims. Syngenta moves to exclude Kaeppler's testimony and opinions. ECF No. 597. Syngenta seeks exclusion of Kaeppler's opinions about: (1) Syngenta's confidentiality practices; (2) forensic issues; (3) the Parties' states of mind; and (4) the usefulness of Syngenta information internally to Syngenta and externally to other parties. Because Smith's opinions and the trade secret misappropriation claims will be dismissed, Kaeppler's opinions are irrelevant to the extent they only apply to those claims. Nonetheless, Kaeppler's opinions are admissible, though perhaps less pertinent now, and Syngenta's motion to exclude Kaeppler's testimony will be denied.

Syngenta first seeks to exclude Kaeppler's opinions about Syngenta's practices to protect its confidential information, contending that these opinions stray beyond Kaeppler's expertise. *See Shipp v. Murphy*, 9 F.4th 694, 701 (8th Cir. 2021) (requiring a

match between the expert's area of expertise and the subject matter of the expert's testimony).  In the paragraph of the report that Syngenta cites as problematic, however, Kaeppler offers very little in the way of opinion regarding confidentiality and merely recites Syngenta's own policy on marking documents as either confidential, secret, or internal use only.  ECF No. 604-1 ("Kaeppler Rep.") ¶ 189.  The only opinion Kaeppler reaches in this paragraph is that because Syngenta had not classified many of the documents at issue as "confidential" or "secret," Syngenta only decided the documents were secret after they were found on Warner and Sleper's devices.  This conclusion is one that Syngenta can rebut, but Kaeppler is not unqualified to offer it.  He can observe what Syngenta's policies say and how those policies relate to the documentary evidence in this case.  Kaeppler's opinion on this point will not be excluded.

Syngenta next seeks to exclude Kaeppler's opinions about forensic issues.  Specifically, Syngenta takes issue with his observation that the Defendants' forensic expert found that neither individual defendant accessed many of the files they allegedly stole from Syngenta after they left Syngenta's employment.  *See, e.g.*, Kaeppler Rep. ¶¶ 187–88, 192.  Syngenta argues again that this testimony is beyond the scope of Kaeppler's expertise.  But Kaeppler is not testifying that he performed any forensic analysis.  Instead, he is quite properly relying on the forensic analysis of another expert, one who, unlike the expert on whom Dr. Smith relies, is available to testify at trial.

Syngenta also opposes Kaeppler's repeated statement that the Defendants' forensic expert's analysis is "consistent with" Kaeppler's conclusion that many of the allegedly stolen documents "would not be useful outside Syngenta, and likely not even outside the

very specific context for which they were created." *E.g., id.* ¶ 194.  Syngenta's argument goes to the weight a jury should give Kaeppler's testimony, however, and not its admissibility.  Kaeppler based his opinions in part on the conclusions of the forensic expert; to the extent that those opinions are flawed as a result, that is a matter for cross-examination.

Syngenta next seeks to exclude Kaeppler's opinions about various Parties' states of mind.  The Parties agree that testimony on the "the intent, motives, or states of mind of corporations . . . and others have no basis in any relevant body of knowledge or expertise." *Kruszka v. Novartis Pharms. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014) (quotation omitted).  Kaeppler's report comments that Warner and Sleper "guessed" or "forgot," and that Syngenta "believed" or "did not consider" certain evidence.  But it stretches Kaeppler's statements to say that they are opinions regarding any party's state of mind.  In one challenged opinion, for example, Kaeppler notes that he did not see any evidence that Sleper had access to a document necessary to connect certain Syngenta internal seed-line names with the names of those lines in the public domain.  Kaeppler Rep. ¶ 253.  Kaeppler states that, because he did not see such evidence, "in at least two instances it appears Dr. Sleper could only guess" at the internal names.  *Id.*  This is not improper opinion on Sleper's state of mind, but rather Kaeppler's opinion as to what occurred based on the evidence Kaeppler reviewed.  This is appropriate opinion testimony.  Another example is Kaeppler's statement that he had seen no evidence that "Syngenta believed" certain information was trade secret.  *Id.* ¶ 189.  At best, this is inartful phrasing on Kaeppler's part.  It is difficult to imagine Syngenta objecting if instead Kaeppler had stated that he had

not seen evidence that "Syngenta considered" information to be secret.  While Kaeppler should avoid characterizing Syngenta's actions as thoughts or beliefs, his opinions regarding what the evidence indicates regarding Syngenta's confidentiality practices as reflected in various documents at issue is admissible.

Syngenta also seeks to exclude Kaeppler's opinions about the usefulness of Syngenta's confidential information internally at Syngenta.  *See* Kaeppler Rep. ¶¶ 194, 199, 203.  These allegedly improper opinions are offered in conjunction with the above discussion regarding the forensic evidence.  According to Kaeppler, the forensic evidence shows that neither Sleper nor Warner interacted with the allegedly stolen data after they left Syngenta's employment, which bolsters his "opinion that these files would not be useful outside Syngenta, and likely not even outside the very specific context for which they were created."  *Id.* ¶ 194.  Syngenta's attack on this aspect of Kaeppler's report is that, because Kaeppler has never worked for Syngenta or any other commercial breeding organization, he is unqualified to testify to the value of the confidential information.  But his testimony is not based on any claimed commercial experience.  Rather, he notes that the data did not appear to be useful to the individual defendants even during their employment and thus was unlikely to be useful to Syngenta as a whole.  Whether this opinion is credible is a matter for cross-examination, not exclusion.

Lastly, Syngenta seeks to exclude Kaeppler's opinions about the usefulness of Syngenta's confidential information externally to parties outside Syngenta.  In one example, Kaeppler opines that Syngenta's internal data regarding its own seed lines is not useful to outside entities, because those entities "would not be able to make use of that

information without access to the same marker sets, the same genetic sequencing, the same

seed lines, and other variables unique to Syngenta." *Id.* ¶ 77.  In other words, according to

Kaeppler, the internal files—the ████████ files that Sleper had on his computer—

required a "key" made up of data not included in those files to be useful to any outside

entity.  Syngenta attacks this testimony on two fronts.  First, as with Kaeppler's other

challenged testimony, Syngenta argues that Kaeppler is unqualified to testify to the value

of the confidential information within the industry because he has never worked in a

commercial breeding organization.  This argument is without merit, given Kaeppler's

acknowledged expertise in the academic side of the industry.  Syngenta's challenge goes

to Kaeppler's analysis of the data, something he is qualified to do.  Syngenta can cross-

examine Kaeppler if it believes there are gaps in his knowledge, but he is qualified to offer

this opinion.  Syngenta's second argument is that Kaeppler did not consider all relevant

facts, rendering his opinion unreliable.  According to Syngenta, because Kaeppler opines

that the files at issue would not be of value externally without additional Syngenta data, he

was required to examine every single file before offering that opinion.  Again, however, if

Kaeppler failed to consider some relevant files, this is a basis for cross-examination, not

exclusion.  Kaeppler sufficiently supports his opinions and the motion to exclude him on

this basis is denied.

B

Both Syngenta and Defendants have engaged computer forensic experts.  Jerry Bui

is the forensic expert for the Defendants, and Robert Meekins is the forensic expert for

Syngenta.  Syngenta moved to exclude the testimony and opinions of Bui, and Defendants

moved to exclude the testimony and opinions of Meekins.  ECF Nos. 555, 588.  Both experts are focused on the computer forensic evidence relating to Syngenta's trade secret misappropriation claims against Warner and Sleper.  *See* ECF No. 557 at 3 (explaining that Syngenta is challenging Bui's opinions that "are relevant to the issue of whether there is computer forensic evidence that Defendants Todd Warner and Joshua Sleper misappropriated confidential or trade secret information"), 5 ("Meekins's expert report offers his opinions as an expert forensic examiner regarding forensic evidence of misappropriation of Syngenta's confidential and trade secret information"); ECF No. 592 at 5 (stating the purpose of Meekins's expert report was "to bridge the gap between Plaintiff's [] allegations and the proof required to establish trade secret misappropriation").  Because the trade secret misappropriation claims will be dismissed, the extent to which these witnesses' opinions—and the Parties' objections—remain significant is somewhat unclear.  To the extent that each witness's testimony is relevant to liability or damages issues with respect to Syngenta's claims against Warner and Sleper, the experts will be allowed to testify.

## C

Donald Gorowsky is Syngenta's damages expert.  He submitted a report outlining Syngenta's damages and other remedies for the trade secret misappropriation and breach of contract claims.  ECF No. 584-4.  Defendants moved to exclude Gorowsky's testimony.  ECF No. 574.

While Defendants also challenge Gorowsky's opinions on breach of contract damages, their arguments are unpersuasive.  *See* ECF No. 579 at 36–39.  Defendants

summarize Gorowsky's opinions, stating his "proffered breach of contract damages opinion amounts primarily to recouping the compensation Syngenta paid to the Individual Defendants during their last year of employment." *Id.* at 36. They make four arguments challenging the breach of contract damages opinions: (1) there is no evidence that Warner or Sleper assisted FBN or shirked their Syngenta duties while employed; (2) the value Sleper provided to Syngenta by helping develop the P-rep trials should have been deducted from any alleged damages; (3) Gorowsky's theory of damages would violate North Carolina's Wage and Hour Act; and (4) Gorowsky's opinions are simple arithmetic that is within the jury's ability. *See* ECF No. 579 at 36–39.

(1) Defendants' argument about the lack of factual evidence showing that Warner and Sleper improperly interacted with FBN and shirked their Syngenta duties is a disputed fact question to be decided by the jury. It is not a ground to exclude Gorowsky's opinions. (2) Defendants' assertion that Gorowsky should have deducted the value Sleper provided to Syngenta via his P-rep trials is not a challenge to Gorowsky's expertise or method—it is a disagreement about an alleged fact's application to the damages calculation. That issue may be addressed on cross-examination. (3) The North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.7, does not apply to this case. The North Carolina Wage and Hour Act prohibits post-employment wage forfeiture without proper notice to the employee. N.C. Gen. Stat. § 95-25.7 ("Employees whose employment is discontinued for any reason shall be paid all wages due on or before the next regular pay day . . . Such wages may not be forfeited unless the employee has been notified in accordance with G.S. 95-25.13 of the employer's policy or practice which results in forfeiture."). However, this Act does not

apply to an employee who lives outside of North Carolina and who worked primarily outside the State, even if the employment contract specifies that North Carolina law governs. *Panos v. Timco Engine Ctr., Inc.,* 677 S.E.2d 868, 874 (N.C. Ct. App. 2009); *Logan v. L-3 Commc'ns Vertex Aerospace LLC*, No. 3:11CV158-RJC-DSC, 2011 WL 13222657, at *2 (W.D.N.C. May 31, 2011).  (4) Defendants' argument that Gorowsky's calculation of contract damages is simple arithmetic—in other words, an issue for which the jury needs no assistance—is unpersuasive.  "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 758. "There is not . . . an implicit requirement in Fed. R. Evid. 702 for the proffered expert to make *complicated* mathematical calculations." *WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011) (emphasis in original); *see also Mint Solar, LLC v. Sam's W., Inc.*, No. 5:19-CV-05167, 2021 WL 1776144, at *2 (W.D. Ark. May 4, 2021); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1086 (D. Minn. 2015). Gorowsky will be allowed to testify about Syngenta's damages relating to Warner's and Sleper's alleged breach of contract. *See* ECF No. 584-4 at 45–48.

D

John Bone is FBN's damages expert.  Syngenta moved to exclude Bone's opinions that projected FBN's sales for its proprietary seed lines.  ECF Nos. 568, 576, 659 at 6 ("Syngenta confines its motion to one aspect of Bone's rebuttal of Gorowsky's damages projections related to alleged trade secrets regarding the ██████████████ trait for corn seed.").  Bone's opinions and projections were offered in relation to the trade secret misappropriation claims, and because the trade secret misappropriation claims will

59

be dismissed, Bone's opinions are now irrelevant.  Syngenta's motion to exclude Bone's testimony will be denied as moot.

VII

The final motion is Defendants' Motion to Strike the Declaration of Dominic Tucker.  ECF No. 702.  Syngenta filed Tucker's Declaration [ECF No. 638] in opposition to Defendants' Motion to Exclude Testimony from Donald Gorowsky [ECF No. 574].  Defendants' Motion to Strike the Tucker Declaration will be denied as moot.

The Tucker Declaration supports Gorowsky's findings.  At the time of his Declaration, Tucker was the Head of North America Applied Genetics for Syngenta.  Tucker testifies regarding Syngenta's analysis in arriving "at the information reflected in Exhibit 4 of Gorowsky's expert report which purports to reflect Syngenta's 'Loss from Misappropriated Trade Secrets.'"   ECF Nos. 705 at 6, 584-4 at 73–75 (Gorowsky's Report).  Specifically, Tucker's Declaration "identified ██████████ in R&D budgeted spend relating to the relevant trade secrets," and Tucker "determined the projects to which Syngenta had overallocated R&D dollars in light of the disclosure to a competitor and the fact that the same R&D spend would not produce the same competitive advantage."  ECF No. 638 ¶¶ 4, 7.

Defendants argue that Syngenta is using Tucker's Declaration as an end-run around Magistrate Judge Thorson's Order that excluded certain documents from evidence.  Exhibit 4 of Gorowsky's report cites "FINAL Syngenta v Warner Seeds Reports 2010_2021 (Damages Analysis).xlsb" and "FINAL Syngenta v Warner Seeds Reports 2010_2021 (TS analysis).xlsb" as the sources for the exhibit.  ECF No. 584-4 at 75.  Those documents are

60

also identified as SYNGENTA01819280 and SYNGENTA01819279.  ECF Nos. 495-1,

495-2.  The documents "are spreadsheets showing selected research and development

budgets" that "were created at the direction of Syngenta's expert, Don Gorowsky, to be

used in connection with his report."  ECF No. 495 at 3.  According to Syngenta, the

documents did not exist before expert discovery, but "[a]ll of the underlying factual

data . . . did exist and was produced during fact discovery."  *Id.*  However, Magistrate

Judge Thorson disagreed and excluded these two documents in her Order dated April 27,

2022.  ECF No. 530 at 5–12.  She explained that Syngenta untimely disclosed the

documents after the discovery deadline had passed, and the untimely disclosure was not

substantially justified or harmless.  *Id.*

Now, Defendants allege that the excluded information contained in those documents

is sneaking its way in via Tucker's Declaration, which is also reflected in Exhibit 4 to

Gorowsky's report.[14]  While Tucker claims his analysis is based on SYNGENTA01784351

and SYNGENTA01819210, which *were* produced during fact discovery, Defendants argue

that is untrue.  Defendants point to Magistrate Judge Thorson's finding that "Mr. Gorowsky

[and, similarly, Tucker] could not have presented his opinion regarding 'actual loss' . . .

relying solely on SYNGENTA01784351 and SYNGENTA01819210" and would have

needed the additional facts supplied in the two excluded documents,

SYNGENTA01819280 and SYNGENTA01819279, to come to his conclusion.  ECF No.

---

[14]    Defendants refer to SYNGENTA01819278 and SYNGENTA01819282 as the cited documents in Exhibit 4 of Gorowsky's report, but that is incorrect.  The cited documents are  SYNGENTA01819280  and  SYNGENTA01819279,  which  matches  with  the Defendants' arguments and cited portions of Magistrate Judge Thorson's Order.

530 at 10–12.  I affirmed Magistrate Judge Thorson's Order, agreeing that "Syngenta had

not disclosed five of the documents, *or the information underlying the documents*, in a

timely manner and had not established that its late disclosures were substantially justified

or harmless."  ECF No. 622 at 2 (emphasis added).  As was explained at that time:

> Syngenta's arguments seem to misunderstand the rationale
> underpinning Magistrate Judge Thorson's ruling.  She
> excluded the documents not just because the documents
> themselves were disclosed after the deadline for doing so, but
> because she determined after a careful and thorough review of
> the record that the data on which the documents were based
> was available to Syngenta long before Syngenta disclosed the
> documents, and thus should have been disclosed pursuant to
> the applicable case-management orders.

ECF No. 622 at 6.  Syngenta is incorrect to think that only the documents themselves, but

not the information within them, were excluded.

After analyzing the excluded documents at issue, Exhibit 4 to Gorowsky's report,

and Tucker's Declaration, it is difficult to see how either Gorowsky or Tucker could arrive

at their conclusions without considering the factual information contained in

SYNGENTA01819280 and SYNGENTA01819279.  Syngenta cannot use Tucker as a

conduit to provide the same exact information that has already been excluded.  If

Syngenta's trade secret misappropriation claims remained at issue, Tucker's Declaration—

or the testimony he might offer—based on the information underlying the excluded

documents would be excluded.  However, because summary judgment will be entered

against those claims, Defendants' Motion to Strike Tucker's Declaration will be denied as

moot.

## ORDER

Based on the foregoing and all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Plaintiff's Motion for Partial Summary Judgment Against Defendants Joshua Sleper and Todd Warner [ECF No. 547] is **GRANTED**.

2.      Plaintiff's Partial Motion to Exclude Testimony and Opinions of Jerry Bui [ECF No. 555] is **DENIED**.

3.      Defendant Warner's Motion for Summary Judgment [ECF No. 561] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to Plaintiff's claims for trade secret misappropriation under federal and North Carolina law and conspiracy to commit trade secret misappropriation.  It is **DENIED** in all other respects.

4.      Plaintiff's Motion to Exclude Bone Projections [ECF No. 568] is **DENIED AS MOOT**.

5.      Defendants' Motion to Exclude Testimony from Donald Gorowsky [ECF No. 574] is **DENIED**.

6.      Defendants' Motion to Exclude Testimony from Robert Meekins [ECF No. 588] is **DENIED**.

7.      Plaintiff's Motion to Exclude Testimony and Opinions of Dr. Shawn Kaeppler [ECF No. 597] is **DENIED**.

8.      Defendants' Motion to Exclude Testimony from Dr. J. Stephen Smith [ECF No. 606] is **GRANTED**.

9.      Defendants' Joint Motion for Summary Judgment Or, In The Alternative, Partial Summary Judgment [ECF No. 614] is **GRANTED**.

10.     Defendants' Joint Motion to Strike the Declarations of Dominic Tucker and Shreyartha Mukherjee [ECF No. 702] is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to the Declaration of Shreyartha Mukherjee.  The motion is **DENIED AS MOOT** as to the Declaration of Dominic Tucker.

11.     This Order is filed temporarily under seal.  On or before February 15, 2023, the Parties must submit any proposed redactions to this Order to the following email address:  tostrud_chambers@mnd.uscourts.gov.    After consideration of the Parties' proposed redactions, if any, a public version of this Order will be filed.

Dated:  February 8, 2023                                s/ Eric C. Tostrud
                                                        Eric C. Tostrud
                                                        United States District Court